## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**FONJECK ERIC AZOH** | **No. 21-CR-412 (CJN)**<br><br>**Sentencing: November 17, 2021** |

### UNITED STATES'S MEMORANDUM IN AID OF SENTENCING

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in support of its sentencing recommendation in this case. Given the nature and seriousness of the defendant's offense, the government requests that the Court sentence the defendant to a period of incarceration at the midpoint of the agreed-upon guideline range. Such a sentence is warranted in light of the sentencing factors outlined in 18 U.S.C. § 3553(a).

### FATUAL BACKGROUND

Between January 2019 and October 2020, the defendant orchestrated a sophisticated nationwide scheme to defraud consumers. (Dkt. 37 ¶ 3-4.)[1] The defendant used various websites which offered pets for sale. (Dkt. 37 ¶ 4.) Those "pets" were nonexistent; they were a ruse intended to trick victims into sending money to the defendant. (Dkt. 37 ¶ 4.) The defendant personally used more than 200 different false identities to interface with victims who wanted to purchase those pets. (Aff. ¶ 25.) The defendant directed his victims to send money as payment for the pet to one of those false identities via a money transfer service, which the defendant

---

[1] "Dkt." refers to the docket entries in this case. "Aff." refers to the affidavit in support of an arrest warrant for the defendant. (Dkt. 1-1.) "PSR" refers to the Presentence Investigation Report prepared by the probation office.

personally collected at money outlets on at least 282 occasions.  (Aff. ¶ 25.)  After collecting the initial upfront fee for the purchase of the pet, the defendant would tell the victims to send even more money to cover purported costs and expenses, which were fraudulent.  (PSR ¶ 15.)  The defendant collected no less than $158,000 in fraudulent transfers from at least 119 different victims who lived in 40 different states.  (Dkt. 37 ¶ 6.)  No less than thirty-six individuals to date have filed consumer complaints after sending money to the defendant.  (Aff. ¶ 26.)

The Arrest

On November 19, 2020, law enforcement agents executed a search warrant at the defendant's residence in Mount Rainier, Maryland.  (Aff. ¶ 43.)  The defendant was not arrested at the time of the search.  (Aff. ¶ 43.)   Nonetheless, the defendant was advised of his Miranda rights; the defendant waived those rights and agreed to be interviewed by law enforcement. (Aff. ¶ 44.)  The defendant claimed that another individual made the fake identification cards that he had used during the scheme; and that he had not used websites as part of the fraud.  (Aff. ¶ 44.) However, the defendant admitted that he had spoken to a victim on the phone once after the victim confronted him about not receiving a dog she had purchased; that he had collected money sent by victims using false identifications; and that he had kept some of the money he collected before sending the remaining proceeds to someone in Africa.  (Aff. ¶ 44.)  At the conclusion of the interview, law enforcement agents served the defendant with a subpoena that required him to appear on December 16, 2020, before a grand jury in the District of Columbia to provide a handwriting exemplar and to produce all documents related to his interests in foreign bank accounts.  (Aff. ¶ 45.)

On December 16, 2020, the defendant failed to appear before the grand jury as required by the subpoena.  (Aff. ¶ 45.)  On December 22, 2020, Chief Judge Beryl A. Howell issued a

material witness warrant for the defendant's failure to appear on December 16.  *In re Grand Jury Subpoena to Fonjeck Eric Azoh*, No. 20-MW-00002.

On January 4, 2021, the U.S. Marshals Service advised the case agent for this matter that the defendant was presently in Mexico City, Mexico.  The Court issued an arrest warrant in the above-captioned matter on January 7, 2021.  (Dkt. 1.)  The defendant was expelled from Mexico on the same date and arrested when he arrived in the United States. (Dkt. 6.)  A Criminal Complaint charged the defendant with having violated 18 U.S.C. §§ 1343 (Wire Fraud), 1349 (Conspiracy to Commit Wire Fraud), 1956(a)(1) (Money Laundering), 1956(h) (Conspiracy to Commit Money Laundering), and 1028A (Aggravated Identity Theft). (Dkt. 1.)

<u>Guilty Plea</u>

The defendant agreed to enter a pre-indictment plea to an Information charging him with one count of Wire Fraud in violation of 18 U.S.C. § 1343.  (PSR ¶ 1.)  In entering a plea to that count, the defendant admitted that he had offered pets for sale on the internet even though the defendant never intended to actually deliver the agreed-upon pet to the victim and that he further defrauded his victims with additional costs and expenses.  (PSR ¶¶ 14-15.)  The defendant always used a false identity when interacting with his victims and directed the victims to send him money through a money transfer business.  (PSR ¶¶ 17-18.)  The defendant then used false identification documents to collect the funds that the victims had sent to the money transfer business.  (PSR ¶ 18.)  The Information identifies 14 instances when the defendant went to money transfer outlets in the District of Columbia and collected money sent by his victims. (PSR ¶ 18.)

As part of his guilty plea, the defendant has agreed to make restitution to the victims in this case of not less than $158,000.  (Dkt. 36 at 7.)  The defendant has also agreed to forfeit U.S.

currency that the government seized from the defendant prior to arrest; he has also agreed to the entry of a forfeiture money judgment in the amount of $92,000. (Dkt. 36 at 7; PSR ¶ 8.)  This Court entered a Consent Order of Forfeiture on August 30, 2021.  (Dkt. 40; PSR ¶ 8.)  The defendant also agreed to the entry of a final order of forfeiture at the time the Court imposes sentence.  (Dkt. 37 at 8; PSR ¶ 8.)

Property to be Forfeited

On October 5, 2020, law enforcement agents with Customs and Border Protection ("CBP") came into contact with the defendant at Washington Dulles International Airport while the defendant was awaiting a flight to Yaoundé, Cameroon.  (Aff. ¶ 35.)  In the course of that contact, CBP asked the defendant whether he was aware of the outbound currency reporting requirements.  (Aff. ¶ 36.)  The defendant stated that he was aware of those requirements; that he had $10,000 with him; and that he had not completed the mandatory FinCEN Form 105, also known as a Currency and Monetary Instrument Report ("CMIR").   (Aff. ¶ 36.)  The defendant then completed a CMIR in which he documented that he was in possession of $10,000 in U.S. currency.  (Aff. ¶ 36.)  However, in a search of the defendant's person and carry-on bags, CBP discovered more than $43,000 in cash.  (Aff. ¶ 37.)  When CBP asked why the defendant had not reported the full amount of currency he was transporting, he claimed the currency over $10,000 was not "his" money because it had been given to him.  (Aff. ¶ 37.)  The defendant then later claimed that he thought he only had to report $10,000 which he had immediately on his person—not the additional cash that he possessed in his carry-on bag.  (Aff. ¶ 38.)  CBP took custody of the full amount of cash and has held the funds for forfeiture.  (Dkt. 36 at 8.)

As noted above, law enforcement executed a search warrant at the defendant's residence on November 19, 2020.  In connection with that search, law enforcement seized $23,000 in

currency.  (Aff. ¶ 43.)  Homeland Security Investigations took custody of the full amount of cash and has held the funds for forfeiture.  (Dkt. 37 at 8.)

## SENTENCING GUIDELINES

As the Court is well aware, although the U.S. Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005).  Thus, at sentencing a court "must first calculate the Guidelines range applicable to the defendant.  *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Pursuant to the plea agreement in this matter, the parties have agreed that the following sentencing guidelines should apply:

| | | |
|---|---|---|
| § 2B1.1(a)(1) | Base Offense Level | 7 |
| § 2B1.1(b)(1)(F) | Loss Amount: $158,000 | +10 |
| § 2B1.1(b)(2)(A) | Mass-marketing to victims | +2 |
| § 2B1.1(b)(11)(A) | Use of authentication feature | +2 |

(Dkt. 36 at 2.)  These guidelines yield a total offense score of 21. (PSR ¶ 33).  In the plea agreement, the government agreed that the defendant should receive a two-point reduction for acceptance of responsibility.  (Dkt. 36 at 2-3.)  The government also believes that the defendant should receive an additional one-point reduction under the guidelines for providing the Court and the government with timely notice prior to indictment of his intention to enter a guilty plea. (Dkt. 36 at 2-3.)  The probation office has correctly calculated that the resulting offense level is 18.  (PSR ¶  37.)

The government at this time has no reason to dispute the probation office's calculation that the defendant's criminal history score falls in Category I. (PSR ¶ 41 ).  With an Offense Level of 18 and a Criminal History of Category I, the guidelines recommend a sentence of 27 to 33 months of incarceration.  (Dkt. 36 at 3; PSR ¶ 83.)

## STATUTORY FACTORS

As the Court is also well aware, after calculating the applicable Guidelines range, a sentencing court must then consider that range as well as the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to that section's enumerated factors, of particular relevance here are the "nature and circumstances of the offense," the need for the sentence "to reflect the seriousness of the offense" and provide "just punishment," "the history and characteristics of the defendant," the need "to promote respect for the law," the need to "avoid unwarranted sentence disparities," and the need for the sentence "to afford adequate deterrence to criminal conduct." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(6), (a)(7).

<u>Nature and Circumstances of the Offense, and its Seriousness</u>

The offense conduct to which the defendant has pleaded guilty is serious by any measure. As the defendant has admitted in entering his guilty plea, "AZOH directly received no less than $158,000 in fraudulent transactions." (Dkt. 37 ¶ 6.) He defrauded "at least 119 different victims who lived in 40 states" and "[t]he average loss to each of those 119 victims was approximately $650." (Dkt. 37 ¶ 6.) The government is aware that the defendant used more than 200 alias identities in connection with the scheme. (Aff. ¶¶ 25-26.)

A scam like this one, by its very nature, involves predatory tactics and manipulation. The defendant deliberately selected prospective pet owners as his victims. This initial lure for this scam—a fake internet sales website—could have targeted people looking to buy office supplies, clothing, or any other item of commerce. However, as the defendant surely knew, dog ownership involves an emotional investment. People think of dogs as a member of their family

and, thus, would be  willing to continue to send the defendant more money for additional fees

when he demanded it.  According to the AARP's Fraud Resource Center, pet sale scams

"typically increase during the holiday season" and such scams have "spiked amid the

coronavirus outbreak as people look to adopt a 'quarantine puppy' to ease isolation or brighten

their lives while sheltering at home."[2]

The people the defendant exploited were acting in good faith and wanted nothing more

than to welcome a dog into their home.  In the time since the defendant entered his guilty plea,

the government has received impact statements from many victims.  All of these victim impact

statements will be provided to the Court in full, but a few of these victims' statements should be

called to the Court's attention:

> *"Our son ... was a victim of Mr. Azoh's internet scheme and as a
> result lost his home and over $65,000 of his income and his life
> savings ... In trying to accommodate each of Mr. Azoh's directions
> to first gain a pet, then save a fictional dying pet, then fictional
> legal charges, then get his money back through fraudulent
> investments, [our son] lost everything.  ... [Our son] has had
> medical issues his entire life which impede his full understanding
> of complex issues. He had just gotten to the point that he felt
> confident, and so did we, that he would be able to support himself
> with our help in his own home.  This man, Mr. Azoh, robbed him of
> that and did it by pretending to be looking out for [our son's] best
> interests, and took him for everything he had and more."*

> *"My family was told it was $600 for the puppy.  We took days off
> work and scheduled a trip to pickup the puppy and all. ... This was
> a calculated and malicious event that really hurt my children and
> wife emotionally."*

> *"I gave some for payment for a dog, I believe $500 ... He kept
> asking for more and more money.  Still [I] never received a dog.
> Because of all this money, I eventually couldn't keep up on bills ...*

---

[2] *See* AARP Fraud Resource Center, Pet Scams (available at https://www.aarp.org/money/scams-fraud/info-2019/pet.html) (accessed November 10, 2021) ("The swindlers are betting that your emotional investment in the anticipated pet will keep the payments coming, into the hundreds or even thousands of dollars.  If you become suspicious, they may resort to threats, claiming the animal will die or you'll be charged with animal abandonment[.]").

> *[The] dog originally was going to be a service dog.  All the money*
> *sent to him [went] down the drain [and] put me out of a home*
> *[and] could not buy food ..."*

In addition to preying on his victim's emotions, the defendant's crime has all of the trappings of sophisticated financial fraud.  The defendant used websites and mass marketing to target his victims.  (Dkt. 37 ¶¶ 4-5.)  In his statement to law enforcement, the defendant admitted that he collected funds sent by victims at various money transfer outlets by using false identification documents.  (Aff. ¶ 44.)  The defendant collected the proceeds at outlets throughout the region at different dates and times, thereby making the scheme harder to detect.  And, as he also admitted to law enforcement, he transferred the proceeds of the scheme out of the country to Africa where they could not be traced or seized.  (Aff. ¶ 44.)

These considerations weigh heavily towards a sentence of substantial incarceration.

<u>History and Characteristics of the Defendant</u>

This matter is not the defendant's first contact with the criminal justice system.  As noted by the probation office, the defendant has one prior conviction in Maryland for Driving while Impaired by Alcohol.  (PSR ¶ 39.)  The defendant was also previously arrested in Maryland during April 2018 on charges of possessing and using false government identification documents.  (PSR ¶ 40.)  The government has learned that at the time of the April 2018 arrest, the defendant had in his possession fifty fraudulent Illinois state driver's licenses and two fraudulent South Carolina driver's licenses, all of which featured a photo of the defendant with different names, dates of birth, and addresses.  (Aff. ¶ 16.)

It is particularly troubling that, to date, the defendant has frustrated the probation office in its efforts to identify his financial assets.  The defendant has not reported any assets that he has outside of the United States (PSR ¶¶ 76-81.), even though he has admitted to law enforcement

that he sent the proceeds of his crime to Africa.  (Aff.  ¶ 44.)  The defendant told the probation office that the government "took his money" and he had no property, vehicles, or additional assets in his name.  (PSR ¶ 76.)  However, the defendant told law enforcement that he "buy[s], sell[s] and ship[s] cars for a living to Africa."  (Aff ¶ 44.)  And the defendant told the probation office that he has no cryptocurrency holdings (PSR ¶ 78), even though he told law enforcement that he "sells Bit Coin" and helps others in Africa to buy Bit Coin.  (Aff. ¶ 44.)  This obfuscation suggests that the defendant may still be hiding some proceeds of his fraud which he has no intention of ever returning to his victims.

These considerations weigh in favor of a substantial period of incarceration.

Promotion of Respect for the Law
General Deterrence, and Avoiding Disparities

Over the past decade, as the Internet has become increasingly indispensable for global communication and commerce, cyber-fraud has become a flood tide that poses significant threats to individuals in the United States and around the world. The FBI's Internet Crime Complaint Center ("IC3") has reported that during 2019 it received more than 400,000 complaints of internet fraud.  IC3 also reports that these scams caused reported losses of more than $3.5 billion.[3]  Notwithstanding the efforts of law enforcement, only a fraction of these schemes result in successful prosecution.  Accordingly, the need for general deterrence for internet fraud schemes is critical.

The defendant did not engage in a single isolated instance of criminal conduct.  He used mass-marketing and the internet to target individuals across the United States.  An appropriate sentence in this case should send a strong message that will deter others from engaging in similar

---

[3] Federal Bureau of Investigation, 2019 Internet Crime Report at 12 (available athttps://ic3.gov/Media/PDF/ AnnualReport/2019_IC3Report.pdf)

conduct.  Moreover, adhering to the sentencing guidelines ensures that other individuals who might commit similar crimes will receive consistent sentences without disparate treatment.

## CONCLUSION

For all of the foregoing reasons, the government submits that an appropriate sentence in this case is for the defendant to serve a period of incarceration at the midpoint of the agreed-upon guideline range, and that the Court also enter orders of restitution and forfeiture consistent with the plea agreement.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By: _____
JOHN W. BORCHERT (Bar No. 472824)
Assistant United States Attorney
Fraud & Public Corruption Section
555 Fourth Street, NW
Washington, D.C.  20530
(202) 252-7679
john.borchert@usdoj.gov

November 10, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of November 2021, I caused a copy of the foregoing

to be served on counsel for the defendant, John O. Iweanoge II, Esq., via the court's ECF system.


_____

JOHN W. BORCHERT
Assistant United States Attorney